Mr. Johnson, right? That's correct, Your Honor. Very well. In just a minute we've got a few folks still moving around here. Do you have a colleague who is also going to be arguing, or is he just there to join you? No, he's here. There you go. Okay. Very well. Please proceed. Thank you, Your Honors. The FBI, the government here, broke open hundreds of safe deposit boxes and searched through all of the contents of those boxes. And then it tried to civilly forfeit everything in those boxes worth over $5,000. And the government did all of this without any particularized probable cause as to the owners of those safe deposit boxes. This is precisely the kind of generalized search that the Fourth Amendment was designed to prevent. Now, the government says that this is permissible because it was an inventory. But the search here, as it was designed by the government before the warrant was even obtained, had an objective function to uncover evidence of crimes. Let me ask you this, Counsel. Obviously, the government does rely upon the inventory search doctrine. Are you aware of any case in our jurisdiction or any other jurisdiction where the inventory search doctrine was applied in facts like these, as opposed to an automobile or a search when somebody was being booked for jail? I am not, Your Honor. And I have looked. I have looked. The only property that I've seen cases involving that's not either an automobile or somebody who's being booked into a jail are homes. And in these cases, the courts have expressed extreme reluctance to apply the inventory doctrine. The Eleventh Circuit in United States v. Ladson says the doctrine simply does not apply to a home. And that case involved a home that was occupied by a third party who was different than the owner. So the home had been seized for forfeiture because of alleged wrongdoing by the owner. It was occupied by a different third party. But I understand that your point is that regardless whether the inventory search applies in a warrant situation, this was not a proper inventory search. That's exactly right, Your Honor. Yes. And I gather the government's response, at least with Lenin, would say, well, this is a home. The home's different. How would you articulate how we should analyze this? This is a location where you've got a lot of safety deposit boxes. The government clearly had the view that some of these folks were dirty, to use the term. But they also wanted to be careful because there might be some, in quotes, good guys in there. So from your perspective, what happened in the what they were planning versus what they documented that you think clearly takes this out from under the inventory search doctrine? Absolutely, Your Honor. So the first thing I would say is just at the highest level, I don't think the government should have opened these boxes in the first place. And so the government's objective here was to put U.S. private vaults, the business, out of business. And the government could have done that without opening a single one of these boxes. There were individuals there on the day of the raid who were trying to access their boxes. They were turned away. And then, obviously— Find out who the owners of the boxes were from the defendant, from U.S.P.A.V. Well, so, Your Honor, U.S. private vaults did actually not know the identity of the owners of the boxes. However, the way that the government ultimately returned property and determined who owned the property and the boxes was by the presence or the possession of a key. So when they broke open the vault, what they did is they actually removed the doors from the vault to keep them whole. And then when people came to claim their property, they would bring the key, and they would put the key into the box door to show that it still worked. And there was no need to look through the boxes in order to effectuate that return. Of course, they also could have just left the doors on the boxes and allowed people to come and claim their property in an orderly fashion. Now— Can I ask you just one question? I think the record's clear, but I want to be sure. My understanding is the record shows that from the beginning, that the government intended to inventory all the boxes and that they did not limit that inventory in circumstances where they could see on the face of the boxes who the owner allegedly was. That's absolutely right, Your Honor. That they made no attempt to contact any of the owners. Is that correct at that time? That is correct, Your Honor. They did not attempt to contact the owners until far after this inventory had already occurred. And putting aside for a moment the inventory search doctrine, was that in violation of the warrant itself? Yes. So the warrant itself provided, first off, that they would conduct only an inventory, not a criminal search or seizure. So there were functions, there were aspects of this search that had the function, the only function, of uncovering evidence of crimes. So, for instance, the use of drug dogs. The district court itself noted there's no purpose, and the government conceded, there's no purpose to having the drug dogs here other than uncovering evidence of crimes. They also opened envelopes and they photographed the contents of documents inside the envelopes. And some of the things that these photographs show are some of people's most sensitive possessions. So, for instance, medical records, vaccination records, legal documents. The inventory records here contain copies of wills, trusts, prenuptial agreements. The argument that the warrant, that it doesn't violate the warrant, I believe, is, you know, there's some language in the warrant itself that seems to indicate that we're only going to be, you know, looking at these things in order to try to figure out who the owners are. But then what they point to is that it did say we will be inventorying them consistent with our standard procedures, and then their standard procedures that normally I assume would apply to something like a car or booking somebody are that, you know, we dig to the bottom of the pile, you know, we look at everything. And so that's basically their argument, I think, that by incorporating our standard procedures, we get to crack open the boxes even. What is your response to that? So I think that my response to that, Your Honor, is that even before they applied for the warrant, they had drafted different procedures, these supplemental instructions for box inventory. And these were drafted five days before the warrant application was submitted. And yet they are not mentioned in the warrant application. The one-time-only policy. We're very familiar with your case, and I want to make sure we have enough time. So I'm kind of curious, what should we rely on? The one-time-only policy seems to be a pretty egregious and distinguishing factor here. You know, people don't do one-time-only policies for cars. I'm a little more disturbed by relying on the fact that it is true that there are elements within this one-time-only policy that seem to have purely an investigatory motive. Drug-sniffing dogs, all this stuff about, you know, how to treat large amounts of cash, et cetera. The problem I see with that is, would you agree that it's at least certainly possible? Let me ask you this. Let's say that somebody had an agency and an automobile inventory policy, and it has all this normal stuff that's purely about inventorying, like please keep track of cash so we don't lose it, please keep track of any watches, et cetera. And then at the bottom it says, if you find a dead body that has been murdered in the trunk, comma, go into investigation mode. First of all, it's almost unnecessary, right, because they're going to go into investigation mode if they find a dead body that's been murdered. Can I ask you, would that make the inventory policy, this fictional inventory policy that has this, it's got investigatory components sort of tacked on, but is that impermissible? Does that make the inventory policy like, does that alone? Because I'm trying to figure, I don't want to do something in this case, this egregious, outrageous case that is going to cause problems in your ordinary run-of-the-mill. No, I understand that, Your Honor. And I think the case that I would point to is United States v. Quirrey from the 11th Circuit. And there, there was an inventory. And then during the process of the inventory, in looking through papers, the officer noted evidence that suggested that, hey, maybe these papers are evidence of a crime. And it was a journal. And then he actually opened the journal, and he started reading through it, and he read all the way through the journal, and he didn't get a warrant. And what the 11th Circuit said was, once you have probable cause, based on something that's in plain view, you should go and you should get a warrant. That all makes sense to me, but dead body in the trunk. Let's go back to, that's more fun. Sure. Dead body in the trunk, it's got some things. It says, A, make sure you don't lose any fingerprints that happen to be on the dead body. B, take pictures so we can, you know, stuff to try to make sure you don't lose any evidence. That doesn't seem totally crazy that a law enforcement agency would add that, you know, if they have a dead body in the trunk problem when they do normal inventory searches. And so, and I'm, you know, that's just one example. I suppose there could be others. How do we distinguish between here, where it seems like it's pretty, and it seems to me that the one-time only policy is one way to skin that cat that doesn't, that doesn't create problems for normal inventory. So I think the difference in the dead body thing is that the dead body there is in plain view, and there's also exigency, right? So if you find the dead body, maybe the evidence is going to deteriorate. You need to get it right away. On the other hand, if there's no exigency, like in the situation in Koorie where it's a journal and the journal's not going anywhere, then you go and you get a warrant. And so I, you know. Now we have our comprehensive testing case. I was on that panel, and we ruled that you can't rely on plain view once you break into this kind of thing. In other words, under our case law, if you go into the box and you see something there and you don't have a warrant to go there or there's some exigency that warrants it, you cannot say, well, I saw this. It doesn't work in our circuit. That's exactly right, Your Honor. I think CDT is exactly on point in the sense that what you have here is the government engineered a search in order to bring information, evidence, into plain view. And then, and not just that, but evidence with respect to hundreds of individuals who are not the actual subject of the warrant. It's exactly like CDT in that respect. What evidence would you cite? And I can't remember. I know there was an agent who was involved in drafting what I'm going to call supplemental instructions. You have, of course, standard instructions, and the district court kind of relied upon it. That was okay. But then there was some supplemental instructions. Were those the ones you were talking about that were prepared five days before the warrant was sought? Yes, exactly, Your Honor. Those are the supplemental instructions on box inventory. They're at ER 890, and they were prepared five days before. And I think it's notable they weren't mentioned in the warrant application. So the warrant application says we're going to follow our standard procedures, and that was simply just not the case. That would go to the issue of basically violating the warrant, right, the terms of the warrant? I think it's actually, it goes both to the violating the terms of the warrant, and it also goes to the inventory doctrine because the inventory doctrine, you know, if you read South Dakota v. Opperman, for instance, you know, the foundation of the inventory doctrine is that the government is following regular, standard procedures, and that the purpose, those procedures are designed to produce an inventory. So here we have procedures that are irregular, they're not standard, and they're frankly not designed to produce an inventory. Do you think that a dog sniffing for drugs cannot help identify the owner? I don't think it can, Your Honor, no. Well, if the owner is a dog, it might. Exactly. And another thing I would like a practical question. I'm trying to figure out what the reason for this case. I mean, it seems like if you ultimately win, you're already law-abiding clients. You're already most, it appears like, law-abiding class. You get their information out. If we give you everything you're asking for, you get their information out of the FBI's files. But, I mean, if we were to rule in your favor, it seems like we would be finding that this whole thing was a egregious violation of everybody who was involved, Fourth Amendment rights, so perhaps the people that own the actual, that actually own the place, right, the racks and all this. So what happens to those people? What happens to, other than this, it seems like a very small remedy. Normally, it seems like a Fourth Amendment right, you would get, people would be able to have some claim. I guess would they be able to, that would get rid of the heck bar, and then people could bring 1983 claims against, is that, I'm just trying to figure out what's the downstream effects, if you get what you want. Yeah, absolutely, Your Honor. You know, so there are some pending forfeiture cases still, judicial forfeiture cases, that have been brought against some of the property that was found in the boxes. I think there could be exclusionary motions in those cases. Although, even there, I think there will be hotly contested issues in terms of, you know, even if the money is excluded, it may still be forfeitable based on other evidence. So it's not clear whether the exclusion necessarily ends the forfeiture case. So there will be issues in those cases. There could certainly be Bivens actions, although I think, as Your Honor, you know, it's a hard row for people to hoe. Franklin doesn't like Bivens. Yes. There also are currently cases that are pending in the district court involving lost property, property that was not returned. And I don't know that this decision here would be directly controlling. And qualified immunity against any actions, because, you know, part of the fact that this was such an unprecedented thing they did, they would try to say they had qualified immunity, right? They certainly would. I'm sure they would argue that, Your Honor, yes. And obviously somebody on the other side would say that the fact that it's so unprecedented just shows how completely contrary to the Fourth Amendment it is. Do you want to save any time? I forgot what you said. Was it five minutes you said or whatever you want to do? I'm happy to save the balance of my time. Thank you, Your Honors. Mr. Rogers, good morning. Good morning, Your Honors. May it please the Court. Hey, Mr. Rogers, can I start you off with a little hypo? Sure. All right, let's assume my two colleagues here decide to retire completely and I decide I'm tired of being a judge. So we all go into business together and buy a bankrupt safe deposit box place, just like the one in this case. And we decide what we're really worried about is that people will think that we are, people will come and say, well, stuff isn't in my box that was in there and they might have it. So what we do is we decide we're going to inventory those boxes, right? So we bring in and we crack every single, we go in and we crack every single one open. Who inventories the boxes? Us, the three of us. We don't have a lot of time on our hands because we're no longer judges, right? So we're sitting there and we're inventorying each one and we bring in, and, you know, Judge Bea happens to have a couple of drug-sniffing dogs, so we bring that in and Judge Smith has a thing that sniffs for, you know, an animal machine that sniffs for other kinds of drugs. It's an AI machine. And we go in and we take pictures and everything. And then somebody decides to sue us and we say, oh, we were just inventorying. Would that pass the straight-face test? In that hypothetical, you're not police officers. Oh, so police officers, so inventorying is different for police officers than because it has a built-in investigatory component? Not necessarily. I didn't think that was probably going to happen. I think that the issue is, and as early as 1976, when the Supreme Court decided South Dakota v. Offerman. Could you speak more directly to the microphone? I'm sorry. I'm sorry. As early as 1976, when the Supreme Court decided South Dakota v. Offerman, the Supreme Court recognized that police officers have a legitimate inventory motive. And that inventory motive based upon South Dakota v. Offerman. I don't know if that's correct. I think what they decided is that an agency, a law enforcement agency, may have a legitimate inventory motive that's built into a broadly applicable policy. And then the idea was, well, it turns out if a police officer may be deviating from that somewhat in the sense that the police officer is following the policy but really, really, really hoping to find some juicy stuff, that that's okay because you have this protective policy that is broadly applicable. So how is that rationale different than this case? It's different because you've got a one-time-only policy. It's different. I do not think there is a one-time-only policy. But leaving that aside for a moment, the police. Wait a minute. You don't dispute that there is a one-time-only policy. Judge Smith is provocatively calling a supplemental policy, but I'm neutrally calling a one-time-only policy. To be very clear with respect to the document, the document was titled Supplemental Instructions on Box Inventory. And the document which was titled that indicated that the FBI was to inventory its boxes in accordance with inventory policy. It is not a one-time policy. It was never construed as such. It is merely additional details to advise officers when they are on the ground how to handle, I agree, the situation. Obviously, the policy is created five days before. So I assume the answer is it was never used before. Has it ever been used since, that policy? Those supplemental, no. Because the supplemental instructions deal specifically with this specific inventory. Can I just break in to get an overall something? I'll tell you why I'm troubled. Okay. As any student of American history knows, one of the reasons why we have the Fourth Amendment was because the British used something called writs of assistance. And as you know, writs of assistance were essentially general warrants. Whenever they thought that's a suspicion, there was smuggling. And, in fact, they did it with tea and things like that. And the colonists were really upset because the British could come any hour of the day, come into their houses and search the materials without probable cause, just search around all over. I'm struggling with why this wasn't a writ of assistance. Because what you've got is a declaration or an understanding that, from the beginning, the authorities intended to search all the boxes, all of them. There was not probable cause available with respect to all of the boxes. But they did it anyway. Now, how do we distinguish that from what the colonists were upset about and which led to the Fourth Amendment? I understand that there are times and reasons for the inventory protection, but, boy, I'm still struggling with how it fits here. If you can do that here, I can think of 20 different ways it could be used to avoid a warrant requirement when it seems clear that the Fourth Amendment was designed to protect it. What am I missing? I think, Your Honor, respectfully, you are missing this point in connection with this. This is a unique situation. Why? Because there is not a situation where you have rampant illegal conduct going on with respect to a facility like this one. Right next to my colleague's offices in downtown San Francisco, you've got rampant illegal conduct going on, but the Fourth Amendment still applies. Open-air pharmaceutical exchange. I'm talking about the extensive illegal conduct that had been going on for a period of years. And I want to go back to the situation where the evidence, in this case, as opposed to different. Certain former Bitcoin operations. No, it wouldn't apply to former Bitcoin operations, but it would apply to this circumstance where the government indicated that it had probable cause, recall, to seize the nest of safety deposit boxes, which were used to facilitate all of private vaults as crimes. And under the policy, and I'm talking about the standard. Let me make sure. The way you just phrased it, you said the government said they had probable cause to seize safe deposit boxes. My understanding was that was not the government's argument. The government had probable cause to seize the facility. And in the course of doing so, it just happened that like half the. No, that's not the argument. The argument is, and there was a seizure. They did not ever tell the judge that they had probable cause to seize the actual safe deposit boxes. They treated that like it was sort of a consequence and a side effect of having, of seizing the facility. The government never said that it had probable cause to seize the contents of the safe deposit boxes. But the government said to the court that it had probable cause to seize the nest of safety deposit boxes. But half the seized the boxes. So why? Tell me why they needed to open the boxes. Here's the reason that they needed to open the box. And this is something that I think has been missed constantly. Under the inventory policy, recall that all the cases that deal with inventory search law require that there be limited or no discretion with respect to what officers do. That inventory policy required officers to immediately open, search, and conduct a thorough. But that's directly contrary to the warrant. The warrant said you wouldn't do that. I think that that's not accurate. The warrant indicated that the warrant did not authorize a criminal search of the inside of the boxes. It did not. That's what happened. You had drug sniffing dogs there. You had all these kinds. You clearly intended. Fingerprints. You thought there was a big criminal conspiracy. Inventory stuff to find criminal violations. The warrant did not prohibit a criminal search relative to the contents. In other words, if there's a warrant that says, I won't do this, but it doesn't prohibit it? To be clear in connection with it, the officer seized the nest of safety deposit boxes. The warrant itself did not authorize. And the government admits it did not have probable cause to search the contents of the boxes. That's a given. But under the inventory policy, not the supplemental instructions, because those are an inventory policy, and the district court indicated that was so. The supplemental instructions did not supplant the inventory policy. Those instructions were the supplemental instructions were drafted, as I understand it, five days before the warrant was sought. Right. They didn't disclose those to the court, right? The purpose, correct. But the purpose of the warrant was to obtain a seizure warrant for the nest of safety deposit boxes and to obtain a search warrant for private falses property. The purpose of the warrant was not to get complete and total approval of the inventory. Recall in connection with this case, officers did not even have to discuss at all the fact that they were going to inventory the contents of the boxes. With respect, counsel, you referred to it as a nest. Yes. Because you can take that term and put it to anything. I don't care what it is, car parts, bank deposits, whatever. You can say there's a nest of gold there or there's a whatever, and you avoid the warrant requirement. You can nest safety deposit boxes. It is true that you need a warrant, and the inventory search doctrine is an exception to the warrant requirement. There's no doubt about that. But we're struggling with here. Sure. Clearly, if the warrant says you can do it, one thing. But here the warrant says you can't, in my judgment, and the inventory search has never been applied in this situation here. And if you apply it in the way you're talking about, it seems to me it basically makes it nothing of the Fourth Amendment. I have two points in response to that. First, the inventory search doctrine has been applied to inventories of residences, and we've cited two cases where that occurs where privacy interests are at their peak. That's at the home, right? At the home. That's correct. We don't have that here. Well, right. But privacy interests in a safe deposit box are lower than privacy interests in a home. Inventory in an apartment building where you have some probable cause to think that the owners of the apartment building are doing something nefarious about all of the tenants, the people that own the ‑‑ I think it's actually been rejected by another circuit in that context, right? That you can't search our three homes within that apartment building. I'm not sure if it has been rejected. My learned colleague discussed an 11th Circuit case, but that case didn't reject that notion that you couldn't search in a home if you only have probable cause with respect to, for example, particular rooms in a home. If you had a large apartment building and you thought somebody, the owners, were doing something nefarious, engaging in sex trafficking or something like that, you could literally go and search every single person's home in that apartment building without a warrant to do that? That is not this case, but let me indicate that. It's not this case. It's not this case because in that circumstance, if there was evidence that the landlord was allowing stash houses inside, apartments to be used for stash houses, that the landlord was renting anonymously and the landlord was attracting persons to be renters without identifying themselves and stashing illegal products and illegal drugs. In that instance, what would you do? You would go and get a warrant to search those stash houses. You wouldn't get a warrant that says, we're going to search this apartment building and we're just going to, like, try to take a peek inside to see if we can figure out who the owners of the other. You would absolutely get a warrant to search the individual houses you thought were being used as stash houses or apartments. If the individual apartments were inside a unit, again, this is a circumstance which is unique. I can't point that out enough. The fact that there is an inventory, recall, why does the inventory have to be conducted promptly? It is to ensure that the police are protected from issues of danger. Let me get to that. So you have two reasons. That's the second. We know it's to protect the police and it's to protect the people from their property getting stolen. So let's go to the second one first. Okay. For the second one, let's go back to our hypothetical. We just bought this place. It's bankrupt, and so we bought it. And we want to make sure, and all of our former clerks have come to work for us, and we know based on experience that they all kind of have sticky fingers, like stuff was disappearing from our chambers. So we say, well, what we should do is we should break open everybody's box and have our clerks who have sticky fingers count everything in there and then put it back, and that's how we're going to make sure people's stuff doesn't get stolen. Do you see where that rationale? So here's the difficulty. What would be another alternative to doing that? Here's the difference. It would be to not open the boxes. Right. Well, that's the alternative, but why doesn't that work here? Because you're worried the boxes are just going to spontaneously explode? That's a safety rationale? Yes, yes. So if the boxes are going to – I've thought about this. Like the boxes are sitting there. If they're anything, they're booby-trapped. You opening them is going to make them explode. You never know what is inside the boxes. You don't know. I say if I have nitroglycerin, so you carefully carry it over, and you set it there and wait until somebody comes up with a matching key. I don't think they're going to explode necessarily if you open the boxes. And also the matching key, there was a discussion about the matching key. Well, they haven't exploded just sitting there, so just leave them until somebody comes and gets them. My point is, I mean, the two rationales, those two rationales work when you're saying, you know, we need to search and make sure there's not a loaded gun in the vehicle for the person we just – and that rationale works that, you know, that guy's going to say we stole his $20,000 that happened to be in his console, so we have to look and make sure there isn't $20,000. That doesn't – those rationales just don't fit real well in this context. There's no time exigency in this situation. I think there is time exigency. Well, officers first have to comply with their inventory policy. If they simply leave the items in place, that's noncompliance with the inventory policy, first of all. And second of all, with respect to the potential danger, fentanyl, for example, you need to open it. Nobody is ever going to make a claim for fentanyl. That box full of fentanyl is going to stay there for years to date. Nobody has raised a claim with respect to that box. But if officers do not know what is inside the box, they cannot satisfy those purposes. So is it the position of the government, really the position of the government, that if you have a nest of whatever you think is bad, that you really don't need a search warrant and a probable cause to search. You just have to have some reason to inventory it. And if you're afraid it's going to disappear or blow up, you can do that. But if it's something that won't do that, what's your excuse for inventorying it if you can get a warrant and go back later? I want to bring this back to the unique situation presented here. This is a one-off situation. It's not a situation, well, because of the unique business model of private vaults. The anonymity. The government is unable to obtain a search warrant because of the anonymity of the boxes. But my partner, my colleague, we're partners in that business that we were talking about. But other than that, the stash house or a slave, you know, sex trade, they're all anonymous. What's the difference? I think the difference in connection with the fact that all of those other entities are anonymous is that here you're not as concerned about the fact that you know that the stash house has drugs. You have that information. You're pretty sure of what is inside the boxes. Here, officers do not have a clue. We're kind of going around in circles. Let me ask you this. If I understand correctly, there were concerns expressed by someone in the government, maybe for the Bureau, that said, I think we've got to have some, or maybe what I'm thinking about was the owner of the facility said, we've got to have some clean people, basically. In other words, the government knew that some of these safety deposit boxes were being used by ordinary law-abiding citizens. So does that make a difference? Sure, that makes a difference. But remember, the reason for the inventory, and I cannot emphasize enough the anonymity. We do not know. Even if there is a document inside the box taped to the inside sleeve, it's called an executor contract that says, I own the box, that's not determinative. In fact, for one of the plaintiffs, one of the named plaintiffs, it was not determinative. There was a wrong name or a wrong address. You have to continue to inventory, particularly in light of the anonymity, to figure out who the true owner is. And doing so, spending four days doing so, officers were able to successfully return hundreds of boxes. At the end of the day, that didn't even make a difference for you, because when somebody came in and said, my name is Joe, and I had an envelope on top that said, this belongs to Joe, you were like, get out your key and show me your key. No, I mean the key is completely incorrect. That discussion about taking a key, that happened years after this inventory. You were going to just automatically forfeit everything. No, that's not correct. We were not trying to forfeit. We commenced administrative forfeiture proceedings. We didn't conclude. You committed that for everybody that claimed to be innocent bystanders. So how does that work? You go and seize everybody's things in the nest, and if they're not dirty, they have to fight the government to get their property back. How does that work? There's not any. There's not any fight. All they have to do is file a one-page document that says I'm the owner. And that, quite frankly, assists. Is that what the record shows? Yes. I mean, that assists officers. That's under 18 U.S.C. 983. I understand, but in this case. Yeah, in this case. I thought you had a whole bunch of people that were really upset. They had to hire lawyers. They had to get all kinds of stuff to try to get their things back. People were given the opportunity, and to dispel the notion that was made that officers made no attempt to contact people, recall when the takedown occurred, there was a notice that was posted, you can contact the FBI to make a request for the return of property because we knew that there were going to be people who wanted their property back. That was immediate. That's not something that's typically done in connection with a search warrant. Give the persons who claim title to the property the right to make a request for the return of property. You're representing to the court that the people who were, in quotes, innocent did not have to go through a civil forfeiture proceeding to get their things back? Some of them did not. Some of them did not. Some of them, not all of them. That's certainly the case. But recall, officers worked extremely hard to identify on it. $5,000, the people that had over $5,000 in cash. Yeah, I think it was actually $15,000, but I realize that there was testimony with respect to this. But I think it was about $5,000 or $15,000. What did they have to do? Did they have to do something different? All they had to do was contact the FBI. If they made a claim, all they had to do was wait 90 days. And if their claim wasn't pursued, if the government didn't file a judicial forfeiture action, the government would turn that money together with interest that they would not have otherwise earned if the money. Drug-sniffing dogs and everything had gone through it, right? I want it to be. We have cited multiple cases that having drug dogs in an inventory is not unlawful. Officers are anticipating that they're going to find evidence. It's not unlawful. The question is what was the motivation of going there in the first place? Right. And under the but-for test, which the plaintiffs failed to establish in connection with this case, the but-for reason for the. . . Your time is up. Let me ask my colleagues whether either has a more question. You've been very . . . You've done a good job. You've done a good job. Thank you for putting up with our question. You can see this is an important matter. I do understand it. Thank you very much, Your Honors. Thank you very much. So we've got some rebuttal time. So I just want to address a very few points, unless Your Honors have questions. One is just I want to just point out in the record, my friend here suggested that perhaps the supplemental instructions for box inventory were not actually a policy. I just want to point the Court to ER 172, where the case agent conceded that the supplemental instructions were, quote, the operative policy for the search. The $5,000 limit, there was some suggestion that might have been $15,000. I just want to point the Court to the record that that's both in the testimony of the case agent and also the testimony of the head of the asset forfeiture office, $5,000, and it's also in the supplemental instructions themselves. Can I ask you, with respect to what you said earlier, you said the supplemental instructions were the operative policy for the search. So these were done at least five days before the warrant was sought, as I understand it. Do I understand correctly that the supplemental instructions were not disclosed to the magistrate judge, nor were they referred to in any way? That is exactly correct, Your Honor. So basically the agency was acting knowing that it had these supplemental instructions. It was not telling the officer who was issuing the warrant about what was the motivation, right? That's exactly right, Your Honor. How do we deal with that? I mean, you know, you've read our CTV case. What do we do with that? I think it's exactly like CDT, where the Court or the government told the magistrate that it was going to follow one set of procedures, the Temura procedures for electronic evidence, and then it just didn't follow those procedures, it didn't follow different procedures. Here the government suggested they were going to follow standard procedures. It turns out there are no standard procedures, and it said it followed these completely different procedures that were never disclosed. The inventory search doctrine, at least nationwide, when it's been applied, the standardization of the policy is a big factor, is it not? I think it's not just a big factor. I think it's a requirement for the policy to apply. So here that basic requirement was ignored from your perspective? Yes, Your Honor. And then money back, let's assume it's over the $5,000, super easy? No, Your Honor. If you're a lawyer, what you have to do is you have to file a claim. It is a one-page document. There are a lot of formal requirements for how to submit it. For instance, it has to be under penalty of perjury. This isn't in the record, but there are studies that show that a large percentage of claims are rejected because people don't include the magical words that it submitted under penalty of perjury, for instance. So there are things that are sort of traps that are lying there in the procedures. What happened here, I remember something, they were going to try to forfeit everything, but the district court judge, because of I think the actions of your firm or something, ended up like saying, no, no, you can't do that or something. Yes, so there were two things that happened to really put the brakes on their forfeiture efforts. And one was that the district court held that the forfeiture notice that was provided violated due process because the government essentially gave a laundry list of offenses and said, this is being forfeited because we think you violated one of these 15 offenses. One of those statutory sites then incorporates the entirety of state criminal law. Did they send the notice to everybody that had one of those pieces of paper that said on the top of their notes? If the property was over the $5,000 limit. They sent a notice? Yes. If it wasn't over $5,000, then what did they do with that? Just wait until that person came and showed up and said, we want our stuff that was in the box. Exactly. And it's true that they put this sign on the window, and the sign essentially said, go to this website and fill out a claim. People then filled out that claim, and it's in the record that then the FBI then investigated them, based on the fact that they submitted this claim. Investigate them in what sense? You mean like a full-scale FBI check of their records and everything? Exactly. They ran them through all manner of criminal databases, based on the fact that they had claimed their property. And then, of course, it took months for people to start getting their property back. What specific relief do you want from us? So in this case, I think what we're seeking, Your Honor, is the same remedy that was provided in CDT, which is that these records should ultimately be destroyed. And all copies of the records? Yes, Your Honor. And that's it? No money? No, Your Honor. There's no claim for money damages in this case. I gather you also want us to say that the inventory search doctrine does not apply in this situation. You know, Your Honor, I think that's vitally important, because I think that ultimately this case is, if what happened here is allowed to go forward, it's the camel's nose in the tent. I guess what I'm trying to figure out, and it kind of goes to my other questions related to these, is how does that really even deter the FBI from ever doing this again? I mean, I assume they did catch a lot of bad people. Yeah, they have to take your clients, who don't really have a record anyway, they have to take their stuff out in case your clients decide to turn to life crime later, I guess it helps them. But, like, I don't understand how this, there's nothing, you know, the suppression rule and stuff deters the law enforcement from bad behavior. How does anything about the relief that we would give deter bad behavior? Well, I think, you know, the first thing I would say, Your Honor, is this is the remedy that's available. So there are forfeiture cases. Most of them have settled. The ones that are remaining. Is there anything else that could piggyback on this that would deter the bad behavior? That could piggyback on if you got the remedy you're asking for. Is there anything in any other actions that would? Yeah, so, you know, again, I think there's the potential for a damages action, although I think, you know, obviously immunity doctrines make that difficult. You know, there are pending cases where people did not get their property back, and they're seeking damages for that. I don't think the legal issue here is determinative there, but I think it's relevant potentially to those cases. In the future. If we said there was no more inventory search immunity and that happened again, then the folks should be on notice. You can't do that. You might have a 1983 action. But that's the future, right? Absolutely, Your Honor. And I think that's, honestly, that is why this case is so vitally important is because, you know, if I was the government and I was looking at the situation right now, I'd think, hey, this worked out okay. You know, we got a couple slaps on the wrist along the way. There was some bad press, but it worked out. And I might very well do it again. And I think that it's important to draw a line in the sand and say this cannot be happened. This cannot happen. We have questions by my colleagues. We thank both counsel. We apologize for being rough on anybody, but this is an important case. And I know that Judge Van Dyke wants us to go into business with him, but I'm not doing it. So I just want you to know, and we thank you all. The court stands adjourned, and indeed for the week. All rise. This court for the session stands adjourned.
judges: BEA, SMITH, VANDYKE